# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 4, 2016

### IN RE MAC L.

**Appeal from the Juvenile Court for Knox County**
**No. 133651    Timothy E. Irwin, Judge**

_____

### No. E2016-00674-COA-R3-PT-FILED-NOVEMBER 22, 2016
_____

This appeal arises from the juvenile court's termination of a biological father's parental rights. The juvenile court found clear and convincing evidence of three grounds for termination and that termination of the father's parental rights was in the best interest of the child. After reviewing the record, we conclude that the grounds for terminating parental rights set forth in Tennessee Code Annotated § 36-1-113(g)(9) and relied upon by the juvenile court were inapplicable to the father in this case. Nevertheless, because there was clear and convincing evidence of two grounds for termination of the father's parental rights and that termination was in the best interest of the child, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Shawn M.

Herbert H. Slatery III, Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

In November 2014, Jessica L. ("Mother"), who was unmarried, gave birth to a son, Mac. Mac's birth certificate did not identify a father. Mac was born with Neonatal

Abstinence Syndrome ("NAS"), a medical condition caused by exposure to addictive opiate drugs while in utero.[1]

Shortly after his birth, the Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Knox County, Tennessee, seeking to have Mac declared dependent and neglected and for emergency temporary legal custody. In the petition, DCS asserted that Mac's biological father was Shawn M. ("Father"). The petition also asserted that Father was incarcerated with pending charges for aggravated assault and theft. The juvenile court placed Mac in protective custody with DCS on November 26, 2014.

Although DCS developed an initial permanency plan in December 2014, both parents agreed to a revised plan the following February.[2] The revised plan had concurrent goals of "return to parent and adoption" and outlined a series of requirements to help the parents achieve the desired outcome of reunification. Because this appeal concerns only Father's parental rights, we focus on Father's responsibilities under the revised plan.[3] Father agreed that he would be responsible for: (1) providing a safe and stable home; (2) obtaining a legal source of income sufficient to meet the family's basic needs; (3) allowing DCS to visit the home to monitor safety issues and appropriateness of the environment; (4) avoiding new legal charges; (5) resolving current/pending legal charges; (6) paying child support; (7) maintaining contact with DCS; (8) completing an alcohol and drug assessment; (9) participating in random drug screens; (10) establishing paternity; (11) completing a psychological evaluation; and (12) demonstrating the ability to handle anger appropriately.

On March 13, 2015, the juvenile court conducted a review of the permanency plan.[4] Both Mother and Father attended. At that time, Mother and Father stipulated that Mac was dependent and neglected "due to [Mother's] substance abuse issues and severe abuse finding with regard to this child and [Father's] incarceration at the time of the removal, inability to provide appropriate care and supervision, mental health issues and substance abuse issues." The court found the responsibilities in the revised plan were

---

[1] *See* Sarah E. Smith, *No Safe Harbors: Examining the Shift from Voluntary Treatment Options to Criminalization of Maternal Drug Use in Tennessee*, 46 U. Mem. L. Rev. 203 (2015) (discussing the issues associated with NAS infants).

[2] The DCS case manager testified the two plans were substantially similar.

[3] DCS sought termination of Mother's parental rights in a separate proceeding.

[4] Review of the permanency plan is mandated "[w]ithin ninety (90) days of the date of foster care placement and no less often than every six (6) months thereafter for so long as the child remains in foster care." Tenn. Code Ann. § 37-2-404(b) (2014).

reasonable and related to remedying the conditions that necessitated foster care. The court also explained to the parents the criteria for termination of parental rights.

After reviewing the parents' progress, the court determined that they were not in compliance with the plan's requirements. With regard to Father, the court found:

> [T]he alleged father is not in compliance at this time. [Father's] visits are not going well. [Father] is argumentative, aggressive and intimidating during visitations. [Father] is not open or receptive to suggestions from the visitation supervisors, stating that he has 8 children and knows how to care for children. [Father] mumbles to [Mother] during the visitation. [Father] was angry that the visitation for the mother and father was separated and he walked out. [Father] has not yet established paternity. [Father] has not done an Alcohol and Drug Assessment and he has not completed a Mental Health Assessment. [Father] is still awaiting his full psychological. [Father] does not have housing. [Father] has pending criminal charges.

Based on these findings and the parents' stipulation, the court declared Mac to be dependent and neglected, reaffirmed the award of temporary custody to DCS, and suspended the parents' visitation rights. The court informed the parents that they could regain visitation, by filing "a Motion to Modify the Visitation and . . . provid[ing] proof to the Court that they are in compliance with the permanency plan, or substantial compliance, and . . . proof that they are able to behave appropriately with the child."

The court held another review hearing on October 21, 2015. Neither parent appeared at the hearing, but their attorneys were present. Based on the evidence provided at the hearing, the court found that Father was still not in substantial compliance with the permanency plan. Although Father had completed a DNA test in June, he had not fulfilled any other requirements, and his whereabouts were unknown.

On November 3, 2015, almost a year after Mac entered foster care, DCS filed a petition to terminate Father's parental rights. At the time the petition was filed, Father had not established paternity. DCS sought to terminate Father's parental rights on the grounds of abandonment by failure to visit or support[5] and substantial noncompliance with the responsibilities in the permanency plan. DCS also asserted Father's parental rights should be terminated under the grounds set forth in Tennessee Code Annotated § 36-1-113(g)(9), which is applicable to "a person who is not a child's legal parent when a termination petition is filed." *In re Bernard T.*, 319 S.W.3d 586, 599 (Tenn. 2010). DCS filed a supplemental petition a few days later asserting Father's parental rights should be terminated on the ground of abandonment by an incarcerated parent.

---

[5] At the close of the hearing on the petition to terminate, DCS withdrew the claim that Father abandoned his child by willful failure to pay child support.

## A. Proof at the Hearing on Termination of Parental Rights

On February 24, 2016, the court held a hearing on the petition to terminate Father's rights. The DCS case manager, the foster mother, and Father testified.

The DCS case manager's involvement with the case began shortly after Mac's removal. She testified that, because Mac suffered from NAS, he spent over a month after his birth in intensive care. Following his discharge from the hospital, DCS placed Mac in the care of a foster family that had experience with his medical condition. He was underweight and had significant muscular rigidity that affected his ability to crawl and, eventually, to walk. Mac needed multiple medical services, including speech, occupational, and physical therapy, to overcome his developmental delay. The case manager also explained that Mac would continue to need multiple services in the future, including a possible leg brace.

The case manager related her efforts to assist Mac's parents. Because Father was in jail when the initial permanency plan was formulated, she testified that she worked with both parents to revise the plan to contain more specific responsibilities for Father following his release. She discussed the plan responsibilities with Father and the criteria for termination of parental rights.

After the March hearing, at which the court found Father was not in compliance with the permanency plan, Father contacted her about scheduling a DNA test. The case manager reminded him of the other requirements in the plan and offered to help him schedule an alcohol and drug assessment and a psychological evaluation. According to the case manager, Father responded that he had had similar assessments in the past and could schedule one through the Helen Ross McNabb Center. She explained she needed him to complete new evaluations but agreed that he could wait and schedule them after receiving the DNA test results.

Father submitted to DNA testing in June 2015, which confirmed that he was Mac's biological father. The case manager testified, however, that after she received the DNA test results, she was unable to locate Father to schedule the evaluations required by the plan. He failed to contact her or update his contact information. When she asked Mother about his whereabouts, Mother informed her that Father was either in Newport or Alabama. The case manager's last contact with Father before the termination hearing was on April 21, 2015. Beyond taking the initial step toward establishing paternity, Father completed no requirements of the permanency plan.

The foster mother described her involvement with the child and his development. Mac came into her home on New Year's Eve 2014, but before that, she visited him once or twice a day in the neonatal intensive care unit. During the first couple of months in

4

her home, Mac would scream continually from 7:00 to 10:00 p.m. each day as he suffered through drug withdrawal. He experienced severe reflux, spitting-up thirty times a day, and had rigidity in his movements.

To address his challenges, the foster mother obtained services through Tennessee's Early Intervention System. Mac saw an occupational therapist and physical therapist, and his movement has improved since participating in hydrotherapy.

Despite the challenges, the foster mother testified that Mac was improving and bonding with her family. She described Mac as "very smart, very quick." The foster mother has two other children, and according to the foster mother, her children interact with Mac on a daily basis and "sing to him and play with him." The foster mother expressed a desire to adopt Mac.

According to Father, he had his life under control until he was arrested in 2014 while on parole. The new charge sent him back to prison, preventing him from attending Mac's birth. After Father's release from prison the following January, he moved in with Mother. He never notified the case manager of his whereabouts because he was "distraught" and "angry" after missing the birth of his child and being "wrongly accused." He claimed the charge that sent him to prison around the time of Mac's birth was later "thrown out."

Father received social security disability payments based on a mental health diagnosis and was on medication to treat depression. He admitted to a prescription drug addiction. Although Father agreed that he had mental health and substance abuse issues, he claimed that he had been treated for them. Father asserted that, in 2014 before Mac's birth, he was evaluated and treated at the Helen Ross McNabb Center for mental health and substance abuse and completed a twelve-step program at Steps House. Father also claimed that he received ongoing treatment at the Helen Ross McNabb Center, but he never explained the services he received to the case manager or signed any releases.

Father blamed his delay in submitting to a DNA test on his inability to find the proper building. He stated that he took no further steps to establish paternity because he did not know what to do. Although he claimed to have asked the case manager and the health department, he conceded that he never asked his attorney.

Father was present at the March hearing when the court found he was not in compliance with the permanency plan and suspended his visitation. According to Father, he was "shocked" when he lost visitation. After the hearing, Father paid for a friend to file an intervening custody petition. Father testified that he thought the custody petition offered him the best chance to see his child.

Father acknowledged that he has been arrested and jailed several times since Mac's birth. An arrest for theft and burglary returned him to prison on October 30, 2015. He testified that he told the judge in his criminal matter that he did not want a bond set for his release because he needed to stay in prison "to get my life in order." As he explained, at that time, he felt his life was "messed up" and that he was "on the wrong track."

Father was released from prison in order to testify at the hearing. He agreed that Mac was in a good place in his foster home but claimed he needed more time to turn his life around so that he could be a part of his child's life. While in prison, he sought treatment from a psychiatrist and was placed on the waiting list for inpatient treatment for his substance abuse issues. He admitted that he had incurred new charges while in prison, but he again claimed that he had been wrongly accused.

## B. RULING OF THE JUVENILE COURT

The juvenile court concluded that DCS had proven by clear and convincing evidence three grounds for terminating Father's parental rights. First, the court terminated parental rights on the basis of abandonment by an incarcerated parent. Father had not visited during the four-month period preceding his incarceration. While acknowledging that Father's visitation had been suspended during that time, the court noted that Father had taken no steps to meet the conditions to resume visitation. The court also determined that Father's pre-incarceration conduct exhibited a wanton disregard for the welfare of the child. The court found Father "wasn't thinking about his child" when he quit working on his responsibilities under the plan, lost contact with DCS, moved in with Mother, and was arrested.

Second, the court determined that Father had failed to substantially comply with the reasonable responsibilities set forth in the permanency plan because he failed to complete any of his responsibilities under the permanency plan other than DNA testing. Third, the court ruled that DCS had proven that Father's parental rights should be terminated under Tennessee Code Annotated § 36-1-113(g)(9) based on his failure to establish paternity.

The court also concluded it was in Mac's best interest to terminate Father's parental rights. The court referenced several of the statutory best interest factors in its order. The court also noted that Mother's parental rights had been terminated under a separate order.

## II. ANALYSIS

A parent has a fundamental right, grounded in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S.

6

645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). However, parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2015).[6]

Tennessee Code Annotated § 36-1-113 sets forth the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, they must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, the parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d at 596 (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *In re Bernard T.*, 319 S.W.3d at 596. "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

A. STANDARD OF REVIEW

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then make our "own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct.

---

[6] In 2016, the Legislature amended the grounds for termination of parental rights and some statutory definitions. 2016-1 Tenn. Code Ann. Adv. Legis. Serv. 172 (ch. 636) (Lexis/Nexis); 2016-2 Tenn. Code Ann. Adv. Legis. Serv. 339 (ch. 919) (Lexis/Nexis). Throughout this opinion, we cite to the version of Tennessee Code Annotated §§ 36-1-102 & 36-1-113 effective prior to the 2016 amendments.

App. 2007). We review the juvenile court's findings as to each ground for termination and as to whether termination is in the child's best interest "regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.* (U.S. Oct. 3, 2016).

## B. GROUNDS FOR TERMINATING PARENTAL RIGHTS

### 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). The juvenile court concluded that Father abandoned his child under the fourth definition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2015).

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found that Father had both willfully failed to visit and engaged in conduct exhibiting a wanton disregard for the welfare of the child.

While it is undisputed that Father was incarcerated when the petition to terminate was filed and did not visit his child during the relevant four-month period, Father contends that his failure to visit was not willful. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. A parent whose attempts to visit are "thwarted by the acts

8

of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810.

Father argues his failure to visit was not willful because his visitation was suspended by court order. An order suspending a parent's visitation rights does not "preclude a finding that [a parent] willfully failed to visit." *In re Adoption of Angela E.*, 402 S.W.3d at 642. When the order includes conditions which would allow the parent to resume visitation, as does the one in this case, our courts have consistently held that a parent who makes no attempt to meet the conditions and seek visitation has abandoned the child. *See, e.g.*, *In re Riley C.*, No. M2015-00541-COA-R3-PT, 2016 WL 626058, at *7 (Tenn. Ct. App. Feb. 12, 2016) (holding that father abandoned his child by failing to take any affirmative steps to regain visitation during the relevant period); *In re Jaylah W.*, 486 S.W.3d 537, 552 (Tenn. Ct. App. 2015), *perm. app. denied*, (Feb. 1, 2016) (holding mother's failure to attempt to fulfill the court's conditions constituted a willful failure to visit); *In re Donald C.*, No. M2014-01327-COA-R3PT, 2014 WL 7465684, at *6 (Tenn. Ct. App. Dec. 30, 2014) (holding mother's choice to not complete the required tasks to resume visitation constituted abandonment); *State v. Dept. of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005) ("Father's choice in refusing to cooperate in this regard constituted a willful decision to discontinue visiting his son.").

The juvenile court explained to Father that he could regain his visitation rights if he filed a motion to modify visitation and provided the court with proof that he had complied, or substantially complied, with the permanency plan and could interact with his child appropriately. Father argues that he made no attempt to meet the court's conditions because they were impossible to fulfill. We disagree with Father's assessment of the conditions. Father could have taken any number of steps to fulfill his responsibilities under the permanency plan to prove to the court he was ready to resume visitation. Instead, he chose to do nothing. His voluntary failure to act was willful. *In re Audrey S.*, 182 S.W.3d at 863.

Father also contends that the juvenile court erred in concluding that his conduct exhibited a wanton disregard for Mac's welfare. "Wanton disregard" is not a defined term, but "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). The court may consider all evidence relevant to determining "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 865-66. We have previously held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute

9

conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

Father claims that there is no evidence that his conduct had a negative impact on his child. But just because Mac was not directly impacted by Father's behavior does not preclude a finding of wanton disregard. *See id.* at 866 (explaining that a parent's incarceration is a "triggering mechanism" for the court to examine the parent's behavior for a pattern of harmful conduct). We agree with the juvenile court that Father's pre-incarceration conduct exhibited wanton disregard for the welfare of his child. Although he claimed the circumstances were not his fault, Father acknowledged being jailed several times since Mac's birth. In addition, Father returned to live with Mother after Mac's removal even though Father described Mother as "the devil in disguise."

Because both distinct tests for abandonment by an incarcerated parent were satisfied, we conclude that DCS proved by clear and convincing evidence that Father abandoned his child. Although one statutory ground is sufficient to terminate parental rights, we must consider each ground relied upon by the juvenile court. *See In re Carrington H.*, 483 S.W.3d at 525-26.

2. Substantial Noncompliance With Responsibilities in Permanency Plan

The juvenile court also found Father failed to substantially comply with his responsibilities in the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014)). If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

Father argues DCS failed to prove that his responsibilities in the plan were reasonably related to remedying the conditions which placed Mac in foster care. Contrary to Father's assertion that the only relevant condition was Mother's substance abuse, Mac was also in foster care because of "[Father's] incarceration at the time of the removal, inability to provide appropriate care and supervision, mental health issues and substance abuse issues." Establishing paternity is a reasonable responsibility for any biological father. Likewise, avoiding repeated incarceration, assessing substance abuse issues, undergoing a mental health evaluation, passing drug screens, and providing a safe home are all reasonable requirements in light of Father's admitted problems. We conclude, as did the juvenile court, that Father's responsibilities in the revised plan were reasonable and related to the conditions necessitating foster care placement.

10

Next, we must determine whether Father's noncompliance with these reasonable requirements is substantial in light of their importance to the overall plan. *In re Valentine*, 79 S.W.3d at 548-49. Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). The only attempt Father made to comply with his responsibilities in the permanency plan was to submit to a DNA test. We recognize that Father's ability to take the steps outlined in the plan has been limited since he returned to prison, but before his current incarceration, he made no effort to schedule the necessary evaluations, to refrain from illegal activities, to secure a safe and stable home, or to cooperate with DCS. While he testified he was unaware of the process for legitimating his child, he failed to take the simple step of asking his own attorney. By his own admission, the only attempt Father has made to get his life in order is to return to prison. While we applaud his efforts to seek treatment while an inmate, these efforts are "too little, too late." *See In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003). Under these circumstances, we conclude DCS has proven by clear and convincing evidence that Father has not substantially complied with his responsibilities in the permanency plan.

3. Failure to Assume Legal and Physical Custody

Finally, the juvenile court determined that Father's parental rights should be terminated under Tennessee Code Annotated § 36-1-113(g)(9),[7] which applies to a person

---

[7] Prior to the 2016 amendments, the statute provided as follows:

The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
　　(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;
　　(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
　　(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(C);
　　(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;
　　(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or
　　(vi) The person has failed to file a petition to establish paternity of the child

11

who is not a child's legal parent when a termination petition is filed. The Tennessee Supreme Court has interpreted the version of the statute in effect when this case was before the juvenile court as being inapplicable to "putative biological fathers." *In re Bernard T.*, 319 S.W.3d at 599 ("The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed."). This interpretation is binding on our Court. *In re Ashton B.*, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at \*13-14 (Tenn. Ct. App. Mar. 15, 2016), *perm. app. denied*, (July 6, 2016). DCS does not dispute that Father is a "putative biological father" as that term has been defined by the Supreme Court. *See In re Bernard T.*, 319 S.W.3d at 598 (discussing criteria for determining whether a biological father is a putative biological father). Therefore, we conclude, and DCS concedes, that the juvenile court erred in terminating Father's parental rights under Tennessee Code Annotated § 36-1-113(g)(9).

## C. BEST INTEREST ANALYSIS

Having found clear and convincing evidence of more than one ground for termination of Father's parental rights, we next consider whether termination is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2). Because "[n]ot all parental misconduct is irredeemable[,] . . . Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i)[8] lists nine factors that courts may

---

within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

Tenn. Code Ann. § 36-1-113(g)(9) (Supp. 2015).

[8] The statutory best interest factors include:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical

12

consider in making a best interest analysis. The focus of this analysis is on what is best for the child, not what is best for the parent. *Id.* at 499. Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

Like the juvenile court, we conclude DCS has proven by clear and convincing evidence that termination of Father's parental rights is in Mac's best interest. Father has made little or no adjustment to his life since his child entered foster care. Even considering his current efforts, it appears unlikely that he will make such an adjustment in the near future based on his lack of progress and pending criminal charges. He has no home. He lost his visitation rights based on his poor behavior and, as a result, has no meaningful relationship with his child. He has yet to be evaluated for his known substance abuse and mental health issues, making it difficult to determine whether his mental and emotional issues would impact his ability to care for his child. Mac has adjusted well in his foster home and formed a strong bond with his foster family. In spite of his multiple medical needs, Mac's foster family is eager to adopt him. Removing this child from the only home he has ever known would be detrimental to his emotional, psychological, and medical condition.

## III. CONCLUSION

We conclude the juvenile court erred in terminating Father's parental rights under Tennessee Code Annotated § 36-1-113(g)(9). Still, the record contains clear and convincing evidence to support terminating Father's parental rights on the remaining two grounds. We also find clear and convincing evidence to support the juvenile court's

condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

conclusion that terminating Father's parental rights is in the child's best interest. Therefore, we affirm the decision to terminate parental rights.

_____
W. NEAL MCBRAYER, JUDGE